CHARLES EDWARD HART, by his Guardian, etc., Appellant, *v.* THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, Respondent.

*Negligence — when a question for the jury.*

In an action brought to recover damages resulting from personal injuries alleged to have been caused by the negligence of employees of the defendant, it was shown that the tracks of the defendant extend to a wharf and down onto a floating bridge, which rises and falls with the tide. On this bridge the defendant stationed an employee, whose duty it was to hand the hawser to an incoming float for the purpose of having the float drawn to the bridge. The float was held in position so that the tracks upon it would connect with the

tracks on the bridge by four steel keys, about seven feet along, permanently attached to the bridge, and which were run out onto the float when the latter was drawn into position, and into boxes or grooves on its deck. When the barge was ready to leave the keys were shoved onto the bridge until another float came.

The plaintiff was in the employ of the New York, New Haven and Hartford Railroad Company as a floatman on one of its floats. The float upon which he was employed went to the bridge of the defendant, but found another float lying alongside of the bridge. An employee of the defendant stated that if the float upon which the plaintiff was engaged wished to get to the bridge it would be necessary to pull the other float away. This was done. The plaintiff, whose duty it was to receive the hawser on the side of his float, took his position for that purpose, and, as the float approached the bridge, one of the steel keys, which had not been drawn back when the other float was pulled from the bridge, struck him, breaking one of his legs.

The accident happened in the evening, and there was a conflict of testimony as to whether the lights on the bridge were sufficient to enable the plaintiff to see.

It was proved that the floats were in the habit of approaching the bridge at all hours of the day and night, and that the bridge was always manned for the purpose of receiving them, and that it was not an unusual thing for an incoming float to remove an idle one lying at the wharf.

It was also shown that the defendant's bridgeman stood with the hawser in his hand ready to hand it to the floatman of the float upon which the plaintiff was. That the keys could have been pulled back into position within two minutes, and that between fifteen and twenty minutes elapsed between the time when the empty float was drawn away and the bridge was reached by the float upon which the plaintiff was stationed.

The negligence charged against the defendant consisted in the fact of its permitting these keys to project beyond the bridge when the float upon which the plaintiff was engaged approached it.

*Held*, that the questions of negligence on the part of the defendant's agents and contributory negligence on the part of the plaintiff should have been submitted to the jury. (VAN BRUNT, P. J., dissenting.)

APPEAL by the plaintiff, Charles Edward Hart, by Samuel M. Hitchcock, his guardian *ad litem*, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 5th day of April, 1893, rendered upon the decision of the court dismissing the plaintiff's complaint, with costs.

*John H. Kitchen*, for the appellant.

*Walter Edwards*, for the respondent.

FOLLETT, J.:

This action was brought to recover damages for a personal injury, caused, is is alleged, by the negligence of the defendant's employees. At the time of the accident the defendant was, and for some years prior thereto had been, in the possession and control of a wharf at the city of Hoboken, known as pier No. 11, which was used for transferring railroad cars to and from floats. The New York, New Haven and Hartford Railroad Company owned and used floats for transporting cars between its railroad and other railroads having terminal facilities on New York harbor. These floats are about 225 feet long and thirty-five feet wide, and have three tracks extending lengthwise of their decks for cars to move and stand on. Each float has a capacity for sixteen cars and is moved from place to place by a steam tug lashed to its side. The wharf is approached through a slip formed by spiles driven on each side and are like ferry slips. Attached to the wharf is an adjustable bridge which rises and falls with the tide, and can be easily brought to the level of the deck of the float. Railroad tracks extend from the yards of the defendant to the wharf and across the bridge. A windlass stands on the wharf operating a hawser which has a ring on the end of it. On the bridge is stationed an employee of the railroad, whose duty it is to hand the hawser to the man standing on the bow of the incoming float, who fastens it to the hook on the float, and then, by means of the windlass, the float is brought to the end of the bridge, after which the bridgeman runs the keys forward into the toggle boxes or grooves on the deck of the float. It is necessary that the ends of the tracks on the float and of those on the bridge should be brought and kept close together and in line so that the cars may be moved to and from the floats. The tracks on the bridge and on the floats are held firmly end to end by four steel keys, which are seven feet long, about four and one-half inches square, and weigh between 700 and 800 pounds each, one being on each side of the bridge and two near the center. They are fastened permanently to the bridge, and when in use are run out about three and one-half feet onto the float and into toggle boxes or grooves. When the float is ready to leave the wharf, the keys should be and usually are shoved back onto the bridge, where they remain until another float comes in. It is the practice and duty of the railroad to operate the bridge and the keys.

On May 15, 1890, the plaintiff was, and for three or four years before had been, in the employ of the New York, New Haven and Hartford Railroad Company as a floatman on its floats. On the date mentioned he was engaged on float No. 23, which at the time was towed by tug or transport No. 5. At about eight o'clock in the evening of the day mentioned, while the tug and float were lying at Harsimus Cove, in Jersey City, the captain was ordered by the New York, New Haven and Hartford Railroad Company to go to defendant's wharf. The order was obeyed, and the float reached the wharf about forty minutes past eight o'clock. When near the wharf, it was found that a float belonging to another line was lying at the bridge. Thomas Gould, an employee of defendant, came from the wharf onto the float lying alongside of the bridge, and said : " If you want to get into the bridge, you will have to pull this float out." Thereupon the persons in charge of tug No. 5 and float No. 23 drew the float lying alongside the bridge out of the slip and left it in a place of safety near by, and then entered the slip. It was the duty of the plaintiff to stand on the starboard side of the bow of his float and receive the hawser, which it was the duty of defendant's bridgeman to hand him. The plaintiff took this position, and as the float was brought near the bridge, one of the steel keys, which, when the other float was pulled out, had not been drawn back onto the bridge, struck him, breaking one of his legs and rendering amputation necessary.

The negligence complained of was in permitting these keys to project beyond the bridge when the float approached it. The night was dark, and there was some controversy on the trial whether the lights on the bridge and on the float were sufficient to enable the plaintiff, had he exercised due care, to see that the keys projected beyond the edge of the bridge.

It was conceded on the trial that the float on which the plaintiff was employed was lawfully at defendant's pier at the time of the accident, and it was testified, and was not contradicted, that cars are transported at all hours of the day and night, and that the bridges are always manned. It was not unusual for an incoming float to remove an idle float lying at the wharf and then take its place. And besides, the captain of float No. 23 was requested by defendant's bridgeman Gould " to pull that float out so they could get in."

So it appears by the uncontradicted evidence that the float on which the plaintiff was employed was at this particular time rightfully at the wharf, and by the authority of defendant's bridgeman removed the idle float and entered in its place. It seems that defendant's employees had ample notice that float No. 23 was about to draw near the bridge, and it was their duty to exercise due care to have it in a safe condition to receive the float. It was also testified, and not contradicted, that in case keys projected beyond the edge of the bridge they endangered incoming boats and their employees. This evidence presented a question for the jury as to whether the employees of the defendant were guilty of negligence which caused the plaintiff's injury. The evidence descriptive of the plaintiff's conduct on the occasion in question is not such as authorized the court to hold, as a matter of law, that he was guilty of negligence which contributed to the accident. The evidence presented two fair questions of fact for the jury: (1) Were the defendant's agents guilty of negligence which caused the injury? (2) Did the plaintiff, by his own negligence, contribute to the injury? and it was error to take the case from the jury.

This case has been before this court on a former appeal. (51 N. Y. St. Repr. 291; 22 N. Y. Supp. 3.) Judging from the statement of facts contained in the opinions delivered on the former appeal, the evidence on the first trial was quite different from that given on the second. For example, it is stated in the leading opinion delivered on the former appeal that, "The Starin float having been detached from the bridge, the bridgeman took one end of the hawser, the other end being made fast to the float, climbed up on the south rack, walked along the rack as the float made off, and, with the assistance of a man put on the float by the captain of the tug, secured the float at the mouth of the slip. * * *

"Before the bridgeman had time to do this work, and return to his position upon the bridge, and before any notice was given that the slip was ready for occupancy, the New Haven float was shoved into the slip." There is no such evidence in this record, and besides, it is testified that the bridgeman stood with the hawser in his hand ready to hand it to the floatman when the float came within reach, and defendant's employees had notice of the coming of the float. By this record it appears that between fifteen and twenty minutes

elapsed between the time when the New Haven tug started to pull out the empty float and the time when the bridge was struck, and that the four keys could be pulled back within two minutes. On the former trial it appears by the opinion that the testimony was that it would take eight or ten minutes to run back the keys. A cursory comparison of the opinions delivered on the former appeal with the present record shows that the facts are quite different.

The judgment should be reversed and a new trial granted, with costs to the appellant to abide the event.

O'BRIEN, J., concurred.

VAN BRUNT, P. J. (dissenting):

I cannot concur in the conclusion arrived at by my associates in this case. I am utterly at a loss to find in this record any evidence of negligence upon the part of the defendant. Whatever negligence there was arose from the impetuosity and undue haste of the pilot of the boat upon which the plaintiff was employed.

It appeared from the evidence that when the float upon which the plaintiff was employed came to the slip of the defendant, it was already occupied by another float, and that they signaled to know whether they could come into the slip and received a reply that they could do so provided they pulled out the float then in the slip. It further appeared that they pulled out the float, and without any invitation or notice that the pier was ready to receive them, the pilot having charge of the float upon which the plaintiff was injured being in a hurry, drove the float into the slip, and one of the plaintiff's feet was caught in the keys which projected from the bridge. It further appeared that this pilot knew of the existence of these keys and that they were out upon the float that was occupying the pier, and that they were required to be pulled back before he could enter the pier with safety. And yet, without any notice that they had been pulled back, or that the pier was ready, he drove his float in and the plaintiff was caught between one of these keys and the deck of the float, the only evidence being that perhaps there was time enough to have pulled in the keys. But I fail to see that there was any negligence upon the part of the employees of the defendant until he was invited to go into the slip after the other float had been removed. Instead of waiting to ascertain

whether the pier was ready, knowing that something had to be done before he could safely enter, he was in such a hurry that he drove his float in, regardless of what might be the condition of the bridge.

In the prevailing opinion it is said: " It seems that defendant's employees had ample notice that float No. 23 was about to draw near the bridge and it was their duty to exercise due care to have it in a safe condition to receive the float." But where there is in this case any notice to them that this incoming float was to be driven in at once is not pointed out. The employees of the defendant had no reason to suppose that the pilot controlling the float, knowing the danger of coming in with these keys projecting, would rush his boat in, regardless of the risk, without ascertaining that the slip had been made ready for his reception. That he was negligent was beyond question. Without an intimation that the bridge was ready to shove his float in, and then because the bridge was not ready, to claim negligence upon the part of the defendant seems to be applying a very harsh rule of diligence, and such as has never heretofore been sanctioned.

The judgment should be affirmed, with costs.

Judgment reversed and new trial granted, with costs to appellant to abide event.